165 So.2d 855 (1964)
Dudley T. ODOM
v.
CHEROKEE HOMES, INC.
No. 1323.
Court of Appeal of Louisiana, Fourth Circuit.
June 1, 1964.
Rehearings Denied July 15, 1964.
*857 John F. Stafford and Sydney J. Parlongue, New Orleans, for plaintiff-appellant.
Midlo & Lehmann, Rene Lehmann, New Orleans, for Menson P. Verret, appellant.
Hugh H. Brister, Rene R. Nicaud, A. Jack Donaldson, New Orleans, Robert D. Edwards, Gretna, for James D. Tillman, III, intervenor and appellant.
Hugh H. Brister, Rene R. Nicaud, New Orleans, Robert D. Edwards, Gretna, for heirs of Cresap, appellees.
Before YARRUT, SAMUEL and HALL, JJ.
HALL, Judge.
This case presents a controversy over the proceeds of the foreclosure sale of 113 lots in a development known as Cherokee Courts subdivision in Jefferson Parish. Claimants to the proceeds in varying amounts are the seizing creditor, Dudley T. Odom, and several intervenors. Together the claimants are the holders of fourteen separate mortgages bearing upon portions of the seized property.
A brief statement of the origin and history of these mortgages is necessary to a better understanding of the issues involved.
In 1958 and 1959 the defendant, Cherokee Homes Inc., purchased four adjoining tracts of unimproved land in Jefferson Parish and consolidated them in an attempt to establish a residential subdivision known as Cherokee Courts. The four tracts are hereinafter referred to as "Parcel A", "Parcel B", "Parcel C" and the "Strip". (See plat of the subdivision reproduced in 132 So.2d at page 56.) Cherokee Homes Inc. made cash down payments on Parcels A, B, and C, and executed vendor's lien mortgage notes for the unpaid portions of the purchase prices. It paid all cash for the "Strip". The four purchases were as follows:
1. Parcel A. Purchased October 16, 1958 from John C. Wagner. Cash down payment, $6,500.00, balance $19,375.00 represented by promissory note of even date secured by mortgage and vendor's lien.
2. Parcel B. Purchased October 31, 1958 from Tropical Radio Telegraph Co. Cash down payment, $38,000.00, balance $115,000.00 represented by promissory note of even date secured by mortgage and vendor's lien.
3. Parcel C. Purchased January 5, 1959 from Mr. and Mrs. Lawrence C. Manguno. Cash down payment, $17,150.00, balance $51,382.50 represented by three promissory notes of even date for $17,150.00 each secured by mortgage and vendor's lien.
A strip 50' × 137' purchased December 1, 1958 from Emile Schenck for $3,500.00 cash. This strip was dedicated by Cherokee Homes Inc. as a street, and is not involved in these proceedings.
After dedication of other streets the subdivision consisted of 141 lots, of which 113 were owned by Cherokee Homes Inc. at the time the petition for foreclosure was filed, 28 lots having previously been disposed of.
The cash down payments on the property were advanced by one Edward Morgan who also made other advances to Cherokee Homes Inc. from time to time, for which he received various hand notes of the corporation *858 the aggregate amount of which was secured by pledge of the following:
1. The capital stock of Cherokee Homes Inc.
2. Collateral mortgage note for $100,000.00 dated October 31, 1958 secured by collateral second mortgage on lands in Parcels A and B.
3. Collateral mortgage note for $48,000.00 dated December 1, 1958 secured by collateral third mortgage on 40 specifically described lots in Parcels A and B.
4. Collateral mortgage note for $4,000.00 dated December 1, 1958 secured by collateral first mortgage on the strip.
5. Collateral mortgage note for $70,000.00 dated January 5, 1959 secured by collateral second mortgage on Parcel C.
As of March 24, 1959 Cherokee Homes Inc. owed Edward Morgan a total of $114,000.00 secured by pledge of the four above described collateral mortgage notes and all of the capital stock of the corporation. By that date Cherokee Homes Inc. had also borrowed various sums from the intervenors herein to finance the off-site improvements in the subdivision and had given mortgage notes to secure these loans as follows:
1. To James D. Tillman, III, two mortgage notes dated December 4, 1958 for $27,000.00 and $9,000.00 respectively, secured by mortgage on all of Parcels A and B.
2. To E. O. Cresap, Sr. two mortgage notes, each for $12,000.00, one dated December 18, 1958 and the other January 7, 1959 secured by mortgages on four lots, two in Parcel B, one in Parcel A, and one partly in A and B (these 4 lots are included in Tillman's mortgages)
3. To Meyer and Helmet Sales Agency Inc. two mortgage notes for $12,500.00 dated June 18, 1959 and June 29, 1959 respectively, the first bearing on lots in Parcels A, B and C and the latter on lots in B and C.
On March 24, 1959 a transaction took place whereby Cherokee Homes Inc. executed and delivered to plaintiff, Odom, its promissory hand note for $120,000.00 secured by pledge of the four collateral mortgage notes theretofore held by Edward Morgan, and Edward Morgan passed out of the picture. The legal effect of this transaction of March 24, 1959 is one of the principal issues in this case.
On this same date (March 24, 1959) Campbell, Watkins and Associates, a partnership composed of William T. Campbell, John F. Stafford, Eben T. Watkins, Thomas E. Smith and Dudley T. Odom (plaintiff herein) loaned Cherokee Homes Inc. the sum of $150,000.00 for which a note dated March 24, 1959 secured by collateral mortgage on 101 specific lots in Parcels B and C was given.
At various times after this date plaintiff, Odom, acquired:
1. The $115,000.00 vendor's lien note on Parcel B from Tropical Radio Telegraph Co.
2. The three vendor's lien notes for $17,127.50 each on Parcel C from Mr. and Mrs. Manguno.
3. The $150,000.00 collateral mortgage note on 101 lots in Parcels B and C originally held by Campbell, Watkins and Associates.
On December 15, 1959, the plaintiff, Dudley T. Odom, instituted these proceedings by foreclosure (in one action) via executiva on:
1. The $115,000.00 vendor's lien note on Parcel B.
2. The three $17,127.50 vendor's lien notes on Parcel C.

*859 3. The four collateral mortgage notes for $100,000.00, $48,000.00, $4,000.00 and $70,000.00 which he held in pledge to secure the payment of the $120,000.00 hand note which he acquired March 24, 1959.
4. The $150,000.00 collateral mortgage note which he acquired from Campbell, Watkins and Associates.
Pursuant to an order of seizure and sale the sheriff of Jefferson Parish seized the 113 lots in Cherokee Courts remaining unsold. Plaintiff asked that the seized property be sold without appraisement, in globo, and without respect to the various mortgages he held.
Prior to the advertisement of the property for sale interventions were filed by James D. Tillman, III, by E. O. Cresap Sr., by Helmet Sales Agency Inc. jointly with Claude E. Meyer, and a fourth intervention was filed which was subsequently voluntarily dismissed as of non-suit without prejudice. Each of the intervenors held mortgages as herein above set forth bearing upon certain lots among those seized. In addition to the other relief prayed for (which will be noted later) the several intervenors sought to have the property covered by their mortgages sold separately from the remaining property seized by plaintiff. To these interventions plaintiff, Odom, filed exceptions of no cause and no right of action aimed at the prayer for separate sales. The District Judge maintained the exceptions and intervenors applied to this Court for writs which were denied; whereupon application for writs was made to the Supreme Court. The Supreme Court issued certiorari to review the judgment of the District Court, and, in a decision reported in 241 La. 824, 132 So.2d 55, reversed the judgment of the District Court, overuled the exceptions of no cause and no right of action, and remanded the case to the Trial Court for further proceedings consistent with the views expressed therein.
Pursuant to the remand, and after due hearing, the District Court by judgment rendered December 12, 1961 ordered the property sold in three separate parcels viz.: Parcels A, B, and C (see plat reproduced in the Supreme Court's opinion cited supra), and ordered the proceeds of the three sales to be held by the sheriff until further orders of the Court. No appeal was taken from this judgment by anyone.
Following this judgment the sheriff offered the properties for sale and on March 14, 1962 the properties were sold as follows:
Parcel A for $17,500.00 to Home Sales Inc.
Parcel B for $225,000.00 to Dudley T. Odom, plaintiff herein.
Parcel C for $81,000.00 to Dudley T. Odom, plaintiff herein.
After trial of certain of the issues involved in the interventions the District Judge on May 16, 1962 filed a memorandum of his views thereon (but withheld formal judgment) and on May 22, 1962 issued an order directing the sheriff to transfer title to Parcels B and C to the purchaser, Dudley T. Odom, upon Odom furnishing security in the sum of $82,000.00. He further ordered that title to Parcel A be transferred to the purchaser, upon payment of the purchase price, and that the proceeds be held by the sheriff until further orders of the Court. He then ordered the case tried on the other issues involved.
Supplemental and amended petitions of intervention were thereupon filed by Tillman and by the Heirs of E. O. Cresap Sr., who were made parties to the suit after the death on September 30, 1961 of Cresap Sr. One Menson P. Verret was made a party to the suit as the alleged holder of the first mortgage note on Parcel A.
After trial of the other issues involved the District Judge rendered judgment on the whole matter on June 28, 1963. Plaintiff, Odom, intervenor, Tillman, and Verret *860 appealed. The Heirs of Cresap Sr. answered the appeals of Odom and Verret. The defendant, Cherokee Homes Inc. filed no pleadings in the cause and has not appealed. (After seizure of the property the defendant filed bankruptcy proceedings and the Referee disclaimed the property.)
For the purpose of clarity the 14 separate mortgages involved in this proceeding are listed chronologically in the order of their dates as follows (there is no contention that this chronological order would be altered by listing the mortgages in the order of their recordation):

 Holder
 of Note Date Amount Type Property
 (1) Verret 10/16/58 $ 19,375.00 Vendor's Lien A
 (2) Odom 10/31/58 115,000.00 Vendor's Lien ($109,000.00) B
 (3) Odom 10/31/58 100,000.00 Collateral A & B
 (4) Odom 12/ 1/58 48,000.00 Collateral A & B
 (5) Odom 12/ 1/58 4,000.00 Collateral Strip
 (6) Tillman 12/ 4/58 27,000.00 A & B
 (7) Tillman 12/ 4/58 9,000.00 A & B
 (8) Cresap 12/18/58 12,600.00 A & B
 (9) Odom 1/ 5/59 70,000.00 Collateral C
 (10) Odom 1/ 5/59(3) 17,127.50 Vendor's Lien ($57,505.05) C
 (11) Cresap 1/ 7/59 12,600.00 B
 Odom 3/24/59 120,000.00 Hand Note
 (12) Odom 3/24/59 150,000.00 B & C
 (13) Meyer &
 Helmet 6/18/59 A, B & C
 (14) Meyer &
 Helmet 6/29/59 B & C

Intervention of Tillman
Tillman intervened as the holder and owner of two mortgages for $27,000.00 (no. 6) and $9,000.00 (no. 7) respectively, dated December 4, 1958 covering all of the lots situated in Parcel B which total 82 whole lots and portions of several others, and also covering all lots in Parcel A. Tillman's interest centers primarily around 20 and a fraction lots in Parcel B (referred to by Tillman as 21 whole lots).
Tillman alleged that as to the 21 lots in Parcel B his mortgages are superior to all of plaintiff's mortgages except the vendor's lien on Parcel B (no. 2), for the reasons that (a) the $150,000.00 mortgage (no. 12) does not cover his lots, (b) plaintiff's collateral mortgages for $100,000.00 (no. 3) and $48,000.00 (no. 4) which do cover his lots are inferior to his mortgages by operation of law since the debt to Edward Morgan which they had been pledged to secure was paid on March 24, 1959 at which time his (Tillman's) mortgages dated December 4, 1958 were of record, and the same mortgage notes were then reissued by the defendant on that date to plaintiff in pledge as security for the $120,000.00 loan; and (c) his mortgages on the two and a fraction lots in Parcel A are superior in rank to any held by plaintiff on those lots. Tillman also alleged (in the alternative) that the $120,000.00 debt, which plaintiff alleged to be due in its entirety should be reduced by certain payments. After the sheriff's sale Tillman, by supplemental pleadings alleged that the $150,000.00 mortgage (no. 12) held by plaintiff, Odom, has been extinguished by virtue of plaintiff permitting the sale of the property covered by that mortgage without a separate appraisal.

*861 Intervention of Cresap (Heirs of Cresap)

Cresap intervened in the foreclosure proceedings as the holder and owner of two mortgages each for $12,600.00 dated December 18, 1958 (no. 8) and January 7, 1959 (no. 11) respectively. Mortgage no. 8 covers lots 2 and 3 of sequare 3 (lot 2 being situated in Parcel A and lot 3 being situated partly in Parcel A and partly in Parcel B). Mortgage no. 11 covers lots 4 and 5 of square 3 (these lots are situated in Parcel B). All of the Cresap lots are likewise included in the lots covered by the Tillman intervention.
Cresap alleged that the vendor's lien (no. 1) on Parcel A, alleged to be held by Verret, had been extinguished and should be cancelled of record. He also (like Tillman) alleged that plaintiff's collateral mortgages for $100,000.00 (no. 3) and $48,000.00 (no. 4) were inferior to his by reason of the reissuance of these collateral mortgages by defendant on March 24, 1959.

Intervention of Meyer and Helmet Sales Agency Inc.
These parties intervened as the holders and owners of two mortgages for $12,500.00 each (nos. 13 and 14) dated June 18, 1959 and June 29, 1959 respectively, the first bearing on lots in Parcels A, B and C and the second on lots in B and C. They contested the credits on certain of the notes held by plaintiff. They are not parties to this appeal since they are last in line of payment and it is obvious the sales proceeds will be exhausted before they are reached.

Verret's Claim
Verret claims to be the holder and owner of the vendor's lien note on Parcel A (no. 1). He did not become a party to these proceedings until after the sheriff's sale. At this sale Parcel A was adjudicated to Home Sales Inc. for $17,500.00. The sheriff thereupon requested Verret to surrender his vendor's lien note so that title could be delivered to the adjudicatee. Verret refused to deliver the note except upon payment to him of $19,899.30 which he stated was the amount of the principal and interest then due on the note.
After being appraised of this situation the intervenors asked that Verret be made a party to these proceedings and ordered him to show cause why his vendor's lien note on Parcel A should not be extinguished or greatly reduced, and further why the inscription of his vendor's lien and mortgage should not be cancelled and erased. Verret filed exceptions to these rules which were overruled by the District Court. He then filed an answer setting forth that he is the owner of the note in question and insisted on his right to full payment of the balance due thereon.

Judgment of District Court
On June 28, 1963 the District Court rendered judgment:
1. Recognizing plaintiff, Odom, as the holder and owner of (a) the three vendor's lien notes on Parcel C (no. 10) with a balance due thereon of $57,505.05 including interest and attorney's fees and entitled to credit for this amount against the purchase price of Parcel C, and of (b) the $115,000.00 vendor's lien note on Parcel B together with 6% per annum interest thereon from October 31, 1958 until March 14, 1962 and 20% attorney's fees on principal and interest and entitled to credit therefor against the purchase price of Parcel B.
2. Recognizing the Heirs of Cresap as the holders and owners of the $12,600.00 mortgage note dated January 7, 1959 (no. 11) and entitled to payment of the full amount thereof with 6% per annum interest thereon from January 7, 1959 until March 14, 1962 plus 15% of principal and interest as attorney's fees from the proceeds of the sale of *862 Parcel B, first after the payment of the amount due on the vendor's lien on Parcel B.
3. Decreeing that the vendor's lien note on Parcel A (no. 1) held by Verret is cancelled, extinguished, null and void and ordering the erasure of the inscription of the mortgage from the records of the Clerk of Court and Recorder of Mortgages of Jefferson Parish.
4. Decreeing that the sheriff's sale of Parcel A to Homes Park Inc. for $17,500.00 is valid and effective and ordering the sheriff to proceed with its execution.
5. Recognizing the Heirs of Cresap as the holders and owners of the $12,600.00 mortgage note dated December 18, 1958 (no. 8) and entitled to full payment of $12,600.00 with 6% per annum interest thereon from December 18, 1958 until March 14, 1962 plus 15% attorney's fees on principal and interest, and decreeing that the proceeds of the sheriff's sale of Parcel A be applied to the payment thereof.
6. Ordering plaintiff, Odom, to deposit with the sheriff, out of the proceeds of the sheriff's sale of Parcel B, an amount sufficient to pay the amount due the Heirs of Cresap on the note dated January 7, 1959 (no. 11), together with a sum sufficient to pay the balance due to the Heirs of Cresap on the note dated December 18, 1958 (no. 8) after application in reduction thereof of the purchase price of Parcel A purchased by Home Parks Inc. for the price of $17,500.00.
7. Decreeing that, after payment of the sums hereinabove set forth, plaintiff Odom be authorized to retain and credit the remaining proceeds of the sale of Parcel B and the proceeds of the sale of Parcel C to the mortgages held by him.
8. Dismissing with prejudice the interventions of Tillman, Meyer and Helmet Sales Agency Inc., and the claims of Verret.
9. Decreeing that the Heirs of Cresap recover all costs, said costs to be paid by plaintiff, Odom.

Opinion

1. The transaction of March 24, 1959.
As of March 24, 1959 Cherokee Homes Inc. had become indebted to Edward Morgan for various advances in the sum of $114,000.00. This indebtedness was secured by the pledge of the four collateral mortgage notes in the amounts of $100,000.00 (no. 3), $48,000.00 (no. 4), $4,000.00 (no. 5), and $70,000.00 (no. 9). On March 24, 1959 a transaction occurred which resulted in the making and delivery to Odom by Cherokee Homes Inc. of its promissory note for $120,000.00 dated March 24, 1959 secured by pledge of these four collateral mortgage notes. The effect of this transaction is one of the principal issues in the case.
The judgment of the District Court as above set forth is based in part on the Trial Judge's finding that there was a novation of the corporation's indebtedness to Morgan and that its effect was a reissuance of the collateral mortgage notes as of March 24, 1959 and therefore the lien of the mortgages quo ad third persons was effective from that date and not from the dates of their original recordation. For this reason the Trial Court held that the Cresap mortgages for $12,600.00 dated December 18, 1958 (no. 8) and $12,600.00 dated January 1, 1959 (no. 11) prime the four collateral mortgages sued on by plaintiff as pledgee thereof.
Plaintiff, Odom, contends in his appeal that the Trial Judge erred in holding that a novation took place on March 24, 1959 and contends that the four collateral mortgages held by Odom should be held to be effective from their respective dates, and should therefore take precedence over the Cresap mortgages.
*863 The issue presented is essentially one of fact. Unfortunately the testimony as to just what took place on March 24, 1959 is in unreconcilable conflict in some respects and is vague in others.
This much is clear: The defendant corporation was in need of more money for off-site improvements. Morgan would not make any more advances and wanted to get out, so the defendant interested plaintiff, Odom, and Campbell, Watkins and Associates (a partnership composed of William T. Campbell, John F. Stafford, Eben T. Watkins, Thomas E. Smith and plaintiff, Odom) in making the loan for the improvements.
After preliminary discussions with Morgan, and by prearrangement, Odom, accompanied by Campbell and Stafford, went to the law office of William H. Talbot, Morgan's attorney, on March 24, 1959 and there plaintiff, Odom, made and delivered to Talbot two checks, one for $114,000.00 payable to Morgan, and the other for $6,000.00 payable to certain trustees. In exchange for the checks, Talbot delivered to plaintiff, Odom, the four collateral mortgage notes and the stock of Cherokee Homes Inc. theretofore held in pledge by Morgan. On the same day the defendant, Cherokee Homes Inc. issued and delivered to Odom its hand note for $120,000.00 secured by pledge of the four collaterial mortgage notes. Whether this note was delivered to Odom before or after the meeting in Talbot's office is in dispute.
After receiving the notes and stock from Talbot, Odom, accompanied by his associates, took the notes to the law office of John Culver, attorney for the defendant, Cherokee Homes Inc. where the deal was completed. At the same meeting in Culver's office, Campbell, Watkins and Associates loaned $150,000.00 to Cherokee Homes Inc. and took as security the corporation's collateral mortgage note for $150,000.00 dated March 24, 1959 (no. 12). Also executed on that day was a certain trust agreement hereinafter referred to.
Plaintiff, Odom, contends that the transaction in Talbot's office was simply a purchase by Odom of the collateral held by Morgan. The Cresap Heirs and Tillman contend that the transaction was a loan by Odom to the corporation with which to pay off its indebtedness to Morgan.
Talbot, who represented Morgan, testified that he sold Odom what Morgan had, including the stock, the four collateral mortgage notes "and whatever other evidence of indebtedness to Morgan that I had" and took Odom's check for $114,000.00 in payment therefor. Talbot's testimony was very vague as to whether he delivered to Odom any hand notes evidencing the primary indebtedness of the defendant to Morgan. At any rate whatever Talbot had was transferred to Odom by simple delivery without Morgan's endorsement and without any assignment being executed. Talbot further testified that Morgan was to get from the defendant corporation three lots in the subdivision as a bonus; that these lots were incumbered with mortgages, and that Odom put up and additional $6,000.00 in escrow to guarantee the release of the mortgages so that Morgan would get clear title to the lots.
John Stafford, who was Odom's attorney, testified that Odom simply bought the pledged collateral held by Morgan; that there were no hand notes representing the corporation's indebtedness to Morgan and that none were transferred; that he presumed the indebtedness was represented by a journal entry on the corporation's books. At any rate there was no assignment to Odom of the primary indebtedness.
Mr. Campbell likewise testified that the transaction of March 24, 1959 was a sale of the pledged collateral to Odom, although on a previous occasion he had testified repeatedly before the Bankruptcy Court that the $120,000.00 put up by Odom was a loan to the corporation. He also testified that Odom received nothing from Talbot except the four pledged notes and stock.
*864 On the other hand Mr. Pope, the business manager for Cherokee Homes Inc., testifying on behalf of the intervenors, said that the transaction was a loan of $120,000.00 made by Odom to the corporation for the purpose of paying off the Morgan indebtedness. Edward Cresap Jr., vice-president of Cherokee Homes Inc., who executed on behalf of the corporation the $120,000.00 note issued to Odom, testified to the same effect.
It would serve no purpose to review the witnesses' testimony in detail, some parts of which are in hopeless conflict. The Trial Judge found that the transaction was a loan by Odom to the corporation for the purpose of paying off the Morgan indebtedness and that Odom was acting for the corporation when he paid Morgan and received the collateral. He also found that there was no question but what the debt to Morgan was extinguished.
After careful consideration of the testimony as a whole we find ourselves in agreement with the Trial Judge's conclusions. Morgan did not own the collateral mortgage notes and stock, he held them in pledge as security for the corporation's indebtedness to him. This indebtedness was not due at the time of the transaction in Talbot's office and Morgan had never made any demand for payment. Obviously Morgan could not sell something he did not own. There was no transfer to Odom of the primary debt owed by the corporation to Morgan, and a sale of collateral divorced from the debt it is pledged to secure would amount to a conversion.
The collateral mortgage notes held in pledge by Odom had a face value of $220,000.00. When Odom appeared at Talbot's office he had knowledge in advance that the indebtedness of the corporation to Morgan was $114,000.00 and this is the exact amount of the check he made payable to Morgan. In addition Odom put up $6,000.00 more than was due to Morgan for the purpose of insuring a clear title to Morgan of three lots which the corporation had agreed to give him in the nature of a bonus. Certainly Odom was acting on behalf of the corporation for the corporation subsequently transferred the three lots to Morgan and included both the $114,000.00 indebtedness to Morgan and the $6,000.00 bonus in the $120,000.00 note which it gave to Odom.
It cannot be contended that the four collateral mortgage notes which were handed to Odom by Talbot became Odom's property by purchase because on the same day they were pledged by the corporation as security for the $120,000.00 note it gave Odom, and Odom sued as pledgee of these collateral notes. The corporation could not have repledged the notes without at least constructively having them in its possession.
When the parties arrived at Culver's office after leaving Talbot they found that Culver on behalf of the corporation had drawn up a new collateral mortgage for $120,000.00 together with a note identified therewith for delivery to Odom. In an attempt to preserve the rank of the four collateral mortgages Odom's attorney insisted that this mortgage not be executed but be destroyed, which was done. Odom's witnesses testified that they wished to avoid anything which might be construed as a novation of Morgan's indebtedness to the corporation. What they say their intentions were is of no consequence if their actions had a legal effect different from such intentions.
We entertain no doubt that what took place in Talbot's office was not a sale of Morgan's collateral to Odom, but was a payment of the corporation's indebtedness to Morgan with funds loaned to the corporation by Odom.
Whether the transaction be considered as a payment of the corporation's indebtedness to Morgan, as we view it, or whether it constituted a novation of the indebtedness by the substitution of Odom as the corporation's creditor in the place of Morgan. (See LSA-C.C. Art. 2189(3)) *865 makes no difference. There was a full extinguishment of the original debt.
Since a pledge cannot exist without a primary obligation to which it is attached, Morgan's pledge ceased to exist and the pledged mortgage notes constructively came into the hands of the corporation. The corporation's subsequent repledge of the collateral mortgage notes as security for the $120,000.00 note it gave to Odom constituted a reissue of the notes by the corporation.
The jurisprudence is clear that the lien of a collateral mortgage dates from the date of issuance or reissuance of the note identified with it and not from the date of recordation of the mortgage. The lien is regarded as being suspended insofar as third persons are concerned during any period in which the note remains unissued in the possession of the mortgagor or during any period between the extinguishment of a debt which the note is pledged to secure, and its repledge as security for another debt. The lien of the mortgage revives upon the repledge of the note and dates from that day. See Walmsley v. Resweber, 105 La. 522, 30 So. 5; Hammond State Bank & Trust Co. v. Broderick, 179 La. 693, 154 So. 739; Meeker v. Commissioners of Clinton & P. H. R. Co., 2 La.Ann. 971; Langfitt v. Brown, 5 La.Ann. 231; Buckeye Cotton Oil Co. v. Amrhein, 168 La. 139, 121 So. 602; D'Meza v. Generes, 22 La.Ann. 285.
The time lapse between payment or extinguishment of one debt and the repledge of the collateral as security for another debt is immaterial.
The lien of the four collateral mortgages (nos. 3, 4, 5 and 9) quo ad intervenors therefore dates from the reissuance and repledge of the notes on March 24, 1959 and not from the dates of their recordation. The mortgages held by the Heirs of Cresap dated December 18, 1958 (no. 8) and January 7, 1959 (no. 11) therefore rank ahead of the collateral mortgage notes held by Odom.

2. The Tillman Intervention.
For the same reason the two mortgages held by Tillman dated December 4, 1958 (nos. 6 & 7) would also appear to outrank Odom's collateral mortgages. The Trial Court however found that Tillman had subordinated his mortgages to Odom's collateral mortgages (nos. 3 & 4).
The Trial Court's finding is apparently based on the following recitation contained in each of Tillman's mortgages.
"The parties hereto take cognizance of the fact that this mortgage is subordinate to the following vendor's lien and mortgages:
"1. (The vendor's lien for $115,000.00 on Parcel B, dated October 31, 1958 (no. 2).
"2. (The vendor's lien for $19,375.00 on Parcel A dated October 16, 1958 (no. 1).
"3. (The collateral mortgage for $100,000.00 on the first described property dated October 31, 1958 * * * (no. 3) * * * and the further collateral mortgage for $48,000.00 on both properties dated December 1, 1958 * * * (no. 4)."
Tillman contends that the language quoted is not a subordination but a mere statement of fact as reflected by the mortgage records; that a subordination would serve no purpose since as of that date his mortgages were obviously inferior in rank to the mortgages described as then outstanding; his mortgages being dated and recorded subsequent to such mortgages. Tillman contends, in other words, that one does not subordinate an inferior mortgage to a mortgage superior in rank.
We cannot construe the language used as being anything more than a recitation that the property was already incumbered by other mortgages. One does not subordinate a mortgage to another mortgage which already outranks it. It cannot be argued that *866 Tillman intended his mortgages would still remain inferior to Odom's collateral mortgages if perchance some unknown future event (such as the transaction of March 24, 1959) would change their former rank.
Beyond the recitation in Tillman's mortgages we have found nothing in the record evidencing any subordination by him other than the fact that he intervened in the $150,000.00 collateral mortgage dated March 24, 1959 (no. 12) and definitely subordinated his two mortgages to that mortgage. Following the recitation in that mortgage of Tillman's intervention and subordination we find the following language:
"The parties hereto take cognizance of the fact that this mortgage is inferior and subordinate to a vendor's lien in favor of Tropical Radio & Telegraph Company in the principal sum of $115,000.00; a vendor's lien in favor of Mr. and Mrs. L. M. Manguno for $51,382.50; a mortgage in favor of any person, firm or corporation for $70,000.00; a mortgage in favor of any person, firm or corporation for $100,000.00; a mortgage in favor of any person, firm or corporation for $4,000.00." (Emphasis supplied)
We do not believe that this recitation can be construed as a subordination by Tillman of his two mortgages to the callateral $70,000.00 (no. 9), $100,000.00 (no. 3) and $4,000.00 (no. 5) mortgages merely because he subordinated his mortgages to the mortgage containing the above recitation.
The recitation like the recitation in Tillman's mortgages is simply a statement of the fact that "this mortgage" (i. e. the $150,000.00 mortgage) is inferior to the other mortgages listed. It is not connected with or part of the contract of subordination to which Tillman as an intervenor obligated himself. If it had been Tillman's intention to subordinate his mortgages to any mortgages other than the $150,000.00 mortgage it would have been so stated in his intervention.
Since we have found no evidence in the record that Tillman intended or did subordinate the liens of his mortgages to the collateral mortgages held by Odom, we hold that Tillman's mortgages dated December 4, 1958 (nos. 6 & 7), like Cresap's rank ahead of the collateral mortgages by virtue of the transaction of March 24, 1959.
As we have seen Tillman expressly subordinated his two mortgages (nos. 6 & 7) to the $150,000.00 mortgage (no. 12). Tillman's mortgages cover all of the lots in Parcel B which is composed of 82 whole lots and portions of 5 others, while the $150,000.00 mortgage covers only 61 specific lots in Parcel B. There are therefore 21 lots in Parcel B which are covered by the Tillman mortgages but which are not covered by the $150,000.00 mortgage. Tillman contends that the subordination had no effect on the 21 lots and that the $150,000.00 mortgage cannot be satisfied in part out of the sale of the 21 lots. He further contends that the subordination can in no manner be construed as an agreement by Tillman that the $150,000.00 debt could be paid from the proceeds of the sale of these 21 lots.
The District Judge said Tillman "* * * subordinated payment of his notes to the payment of the $150,000.00 note secured by mortgage dated March 24, 1959." Tillman contends that there is no evidence in the record showing such a subordination. There is, he concedes, an agreement in the record dated March 24, 1959 to which he was a party, whereby Odom and Pope were appointed Trustees for Cherokee Homes Inc. and for various mortgage holders for the purpose of receiving the sales prices of all lots sold by Cherokee Homes Inc., and of distributing such proceeds in reduction of the mortgages held by the parties, and that in this agreement the $150,000.00 mortgage was preferred over his mortgages as to such distribution. However, Tillman argues that this agreement applied only to the proceeds of conventional sales and not to the proceeds of the foreclosure sale. *867 Moreover he contends that the effects of this agreement ceased and was terminated when Odom withdrew and commenced foreclosure proceedings.
We are of the opinion that Tillman's contentions in this respect are sound and that the District Judge erred in holding that Tillman subordinated payment of his notes to the payment of the $150,000.00 note and that such subordination applies to the proceeds of the foreclosure sale.
We hold that Tillman's mortgages (nos. 6 and 7) outrank Odom's collateral mortgages (nos. 3 & 4); that his mortgages outrank the $150,000.00 mortgage (no. 12) insofar as 21 lots in Parcel B are concerned, and that he did not subordinate payment of his notes out of the proceeds of the sale to payment of the $150,000.00 note.
But Tillman goes further and contends that Odom, by permitting the sale of Parcel B in globo without separate appraisement of the 61 lots thereof to which the $150,000.00 mortgage applied, thereby lost all preference rights of this mortgage in the property or in the proceeds. In the alternative he argues that plaintiff waived and is estopped from asserting any right of that mortgage to the prejudice of Tillman whose mortgages covered the entirety of Parcel B.
The record reveals that pursuant to the Supreme Court's remand (See 241 La. 824, 132 So.2d 55) and after due hearing, the Trial Judge rendered a judgment on December 12, 1961 ordering Parcel B to be sold in globo, which judgment the District Judge said "was in accordance with the Court's interpretation of the judgment of the Supreme Court." Neither Tillman nor anyone else sought an appellate review of this judgment. The District Judge, correctly in our opinion, disposed of Tillman's contentions as follows:
"Although Odom instituted these proceedings, after the Supreme Court held intervenors had certain rights, the judgment of the Court ordering the sale was rendered, not on the order of executory process, but as much on behalf of intervenors as plaintiff. Odom cannot be held to have waived or lost any rights when the Court ordered the sale in a manner it deemed proper in the circumstances."
Actually Tillman's argument is a two-edged sword, for it might equally well be argued that Tillman, by not seeking timely appellate review of the judgment of December 12, 1961, acquiesced therein, thus permitting the sale of Parcel B to be effected without separate appraisal of the 21 lots and thus lost whatever rights he had in the proceeds of the sale of Parcel B.
We are confronted with the fact that the proceeds to be distributed represent the sales price of all of Parcel B. Odom's $150,000.00 mortgage covers 61 of the 82 whole lots in Parcel B, but does not apply at all to the remaining 21 lots. Odom's $150,000.00 mortgage on the 61 lots prime Tillman's mortgages on these 61 lots by reason of Tillman's subordination, but Odom has no mortgage at all on the 21 remaining lots which are covered by Tillman's mortgages and there was in our opinion no subordination by Tillman of the payment of his notes to the payment of the Odom note.
The sale in globo of Parcel B was a valid sale and no one has attacked the sale itself, but we are called upon here to distribute the proceeds remaining after payment of the vendor's lien among three mortgage holders (according to their respective interests) none of whose mortgages covers the entire parcel.
After payment of the vendor's lien held by Odom (no. 2), Tillman's mortgages (nos. 6 and 7) are superior to any of the mortgages affecting Parcel B but insofar only as to Part lot 3, and lots 4 to 13 inclusive of Square 3; lots 10 to 16 inclusive of Square 6; and lots 13 to 15 inclusive of Square 5.
*868 Cresap's mortgage (no. 11) ranks next after Tillman but insofar only as lots 4 and 5 of Square 3 are concerned; and Cresap's mortgage (no. 8) ranks next after Tillman but insofar only as Part lot 3 of Square 3 is concerned.
After payment of the vendor's lien (no. 2) to Odom, Odom's $150,000.00 mortgage (no. 12) is superior to any of mortgages affecting Parcel B but only insofar as to the lots situated in Parcel B which are not subject to the Tillman and Cresap mortgages as above set forth.
There is no evidence that all of the lots situated in Parcel B are of equal value and we cannot presume that they are. To distribute the proceeds of the sale between Tillman, Odom and the Cresap Heirs according to their respective interests is a manifest impossibility as the record now stands.
In order that the proceeds may be distributed it is necessary to remand the case to the District Court in order that an appraisement be made of the relative value, as of the date of the sheriff's sale, between: (a) the lots and part lot situated in Parcel B whereon the Tillman mortgages (nos. 6 and 7) are superior, (b) the remaining lots in Parcel B whereon the Odom $150,000.00 mortgage (no. 12) is superior. It will also be necessary that a like appraisement be made of the value of lots 4 and 5 of Square 3 covered by Cresap's mortgage (no. 11) and the value of Part lot 3, Square 3 covered by Cresap's mortgage (no. 8) as compared with the value of the lots and part lot situated in B whereon Tillman's mortgages (nos. 6 & 7) are superior. (In this connection, compare Act 92 of 1962 amending LSA-C.C.P. Art. 1092).

Verret Claim
This claim relates to Parcel A and the vendor's lien and mortgage (no. 1) originally held by John Wagner. This note was not placed in foreclosure by plaintiff, Odom, because he did not own the note at the time he foreclosed, although he acquired it soon after and subsequently transferred it to Verret.
As heretofore set forth Verret did not become a party to these proceedings until after the sheriff's sale. After the adjudication of Parcel A to Homes Sales Inc. for $17,500.00 Verret notified the sheriff that he held the vendor's lien note covering Parcel A and that he would refuse to surrender the note so that title could be delivered to the adjudicatee unless he was paid the full amount due on the note which he calculated to be $19,899.30. When the intervenors and holders of junior mortgages learned of this demand by Verret they asked that he be made a party to the proceedings and be ordered to show cause why the note should not be decreed extinguished or greatly reduced. After trial on the rule judgment was rendered declaring that the vendor's lien note held by Verret had been extinguished, was null and void, and that Verret has no right to any of the proceeds of the sale of Parcel A.
The vendor's lien and mortgage was created by an Act of Sale dated October 16, 1958 from John Wagner to Cherokee Homes Inc. This sale conveyed a body of land by metes and bounds but provided that the vendor would permit the re-subdivision of the property and the dedication to public use of certain streets and access roads, and provided that upon such dedication the areas dedicated would be released from the mortgage.
In accordance with the Act of Sale the property was resubdivided by the vendee, Cherokee Homes Inc., and the dedicated areas were released from the mortgage. In the re-subdivision the bulk of the Wagner tract became what is referred to as Parcel A. There were a few lots out of the tract which fell into other subdivisions with which we are not here concerned. The vendor's lien covered all of Parcel A.
*869 All of Parcel A was disposed of to third parties before these foreclosure proceedings were filed except three whole lots and a fraction of another lot (being lots 1 and 2, Square 3, lot 8, Square 7 and Part of lot 3 Square 3). These are the lots which were sold by the sheriff. The Heirs of Cresap hold mortgages on some of these lots and are consequently interested in the extinguishment of the vendor's lien.
The basis of the holding of the District Court is the fact that the Act of Sale from Wagner to Cherokee Homes Inc. which created the vendor's lien, contains a partial release clause which reads as follows:
"It is further agreed and understood between the parties hereto, that upon approval of a plan of subdivision by the Jefferson Parish Council and the dedication and acceptance for maintainance of streets and access roads which are hard surfaced and all weather streets as aforesaid, that the vendor herein or any further holder of the vendor's lien and mortgage note will release from coverage of said Vendor's lien and mortgage, lots as shown thereon, having a square footage between 5,500 square feet and 6,500 square feet and that the release price per lot shall be computed at a figure which will liquidate the entire balance due on the aforesaid Vendor's lien and mortgage when 75 percent of said lots have been released. Any payments made on lot releases shall include interest on such amount to date of payment and will be credited on the next maturing installment of the mortgage note. No release shall be made for less than two lots and no lots shall be released prior to January 1, 1959." (Tr. p. 249)
The District Court found as a fact that considerably more than 75% of all lots constituting the Wagner tract had been released and therefore held that the vendor's lien was extinguished in its entirety.
It is necessary here to digress for a moment.
On March 24, 1959 Cherokee Homes Inc. sold to Campbell, Watkins and Associates (plaintiff Odom being one of five partners therein) a total of 18 lots, 8 of these lots and portions of 3 others being situated in Parcel A. This sale was made subject to the Wagner vendor's lien.
In August and September of 1959 Wagner, being the then owner of the vendor's lien note, released from the mortgage the street areas dedicated by Cherokee Homes. He also released 2 lots for which he received $3,150.00 and applied this amount on the principal of the note.
On January 15, 1960 Odom bought the note from Wagner, paying therefor $17,450.87 being the amount of the reduced note plus $1,285.87 interest. (Odom's suit was filed December 15, 1959 so this note was not foreclosed).
At the time Odom acquired the note the partnership, Campbell, Watkins and Associates, in which Odom had a 1/5 interest, still owned the 18 lots (8 lots plus being in Parcel A) acquired by them on March 24, 1959.
On February 9, 1960 the 8 whole lots in Parcel A belonging to the partnership were released from the vendor's lien and on February 23, 1960 the partnership sold these 8 lots to one Boudreaux.
On March 14, 1960 the remaining property situated in Parcel A which the partnership had acquired on March 24, 1959 (being portions of 3 lots) was sold by Campbell, Watkins and Associates together with the remaining lots they had thus acquired to Northern Homes Inc.
On February 21, 1961 the vendor's lien mortgage was released as to all lots and part lots sold to Northern Homes Inc.
On May 15, 1961, there was another release of the vendor's lien.
*870 On June 5, 1961 Odom transferred the vendor's lien note to Verret under a verbal arrangement whereby Verret agreed to pay Odom $15,000.00 for the note if either (a) Verret became the successful purchaser at the sheriff's sale of the unsold lots in Parcel A or (b) if Verret could turn a profit over the price of adjudication by collecting more than $15,000.00 on the note. Verret admitted that he was not obligated to pay Odom anything unless he chose to do so by reason of one of the foregoing conditions, and that as of the date he testified (February 15, 1963) he had in fact paid Odom nothing for the note.
However peculiar this arrangement might be Verret became the holder of the note (See LSA-R.S. 7:191) and payment to him would discharge it (See LSA-R.S. 7:51). However Verret does not pretend to be a holder in due course (as a matter of fact the note was past due and in default when Odom acquired it) and is subject to all defenses that might be urged against Odom.
The Heirs of Cresap contend that upon purchasing the 18 lots on March 24, 1959 Campbell, Watkins and Associates allocated to Odom on their partnership books the 8 lots situated in Parcel A and thus when Odom purchased the vendor's lien note from Wagner he became both the owner of the 8 lots and the owner of the mortgage thereon and confusion took place. There is no merit in this contention because title to the 8 lots was never transferred to Odom.
The Heirs of Cresap further contend that the vendor's lien note was extinguished under the provisions of the above quoted partial release clause contained in the Wagner Act of Sale, more than 75% of the lots having been released.
Verret does not contend that 75% of the lots had not been released, but contends that there is no proof that Odom who owned the note from January 15, 1960 to June 5, 1961 (during which period all of the releases took place except for the 2 lots released by Wagner) received any payment for the releases, and therefore the note was not "liquidated". Verret cites many cases to the effect that a mortgagee has the right to release a part of the mortgage security and still enforce his note in toto against the unreleased portion. No one disputes this proposition. It is simply inapplicable here.
The question is whether Odom received payment for the releases. In our opinion, Odom, as mortgagee, was bound by the partial release clause to receive the release price whenever a release was made and there is no proof that he did not.
The vendor's lien on the 8 lots in Parcel A was released a few days before the sale of the lots to Boudreaux. It can be assumed that the sale price included an amount to discharge the vendor's lien pro tanto. Either Odom got the release price or his partnership kept it. When the remainder of the 18 lots acquired by Campbell, Watkins and Associates (which included 3 part lots in Parcel A) were sold to Northern Homes Inc. for $40,000.00 it was specifically agreed that the vendor's lien would be released, and it was subsequently released in accordance with the agreement. We are unwilling to assume that the sale price did not cover enough for the release, and either Odom got the release price or his partnership kept it.
The District Judge held that the payment for the releases was a matter for settlement between Odom and his co-owners and we agree with his holding. Since the partial release clause fixed a release price per lot which would liquidate the entire balance due on the vendor's lien and mortgage when 75% of the lots shall have been released, and since over 75% of the lots have been released, we are of the opinion, as was the District Judge, that the vendor's lien note on Parcel A (no. 1) has been extinguished, is null and void, *871 and that Verret has no right to any of the proceeds of the sale of that parcel.

Amount Due on $120,000.00 Note
The District Judge held that the $120,000.00 hand note held by Odom is subject to a credit of $9,625.00. This is the note which is secured by pledge of the four collateral mortgage notes (nos. 3, 4, 5 & 9). Odom contends that the note is subject to no credits whatever, and moreover contends that he is entitled to 10% attorney's fees thereon. The District Judge did not pass upon the attorney's fees.
Under an agreement dated March 24, 1959 Odom and C. W. Pope were appointed as Trustees by Cherokee Homes Inc. and certain mortgage holders, including Tillman, with the duty and authority to receive the net proceeds of sale of lots in the subdivision and to distribute such proceeds to the mortgage holders in accordance with the terms of the agreement. The agreement provides, after setting forth that Odom was the owner of the $120,000.00 note secured as aforesaid, and Campbell, Watkins and Associates was the owner of the $150,000.00 note (no. 12), that the sum of $2,700.00 would be paid to Odom and Campbell, Watkins and Associates, jointly, together with the sum of $400.00 per site. A total of $19,250.00 was paid under this agreement, all of which was applied to the $150,000.00 note. As remarked by the District Judge, there is no doubt but that the agreement anticipated reduction of both notes, the $120,000.00 note held by Odom, and the $150,000.00 note held by the partnership of Campbell, Watkins and Associates, in which Odom was a partner. The District Judge therefore held that the $120,000.00 note should be credited with one-half of the amount of $19,250.00 which was paid, or the sum of $9,625.00.
When the trustees, Odom and Pope, came to distribute the $19,250.00, they made out two checks totalling this amount payable to Campbell, Watkins and Associates. The partnership thereupon deposited the checks in the partnership account and credited the whole amount to their $150,000.00 note. Odom contends that, although Odom and Pope were trustees, the manner in which the payment of $19,250.00 was applied cannot be contested because under LSA-C.C. Art. 2163 the debtor of several debts has a right to declare when he makes a payment what debt he means to discharge, and the trustees, as debtor, had a right to pay the total amount to Campbell, Watkins and Associates. Odom further contends that in the absence of fraud a third person cannot require an imputation of payment between a creditor and a debtor to be changed.
The District Judge disposed of these contentions, correctly in our opinion, as follows:
"Odom and Pope were trustees, and, as such, they acted in a fiduciary capacity. One of the intervenors, Tillman, was a party to the trust agreement. The fact that Tillman may or may not benefit by insisting that the terms of the agreement be met, is immaterial. Not only Tillman, but all interested parties are affected by this agreement, and the trustees were without right or authority in law to substitute their wishes in place of their contractual obligation. Odom, as trustee, did not have the right to apply payments made pursuant to this agreement in any manner other than as designated by the agreement. This is particularly true since he had complete ownership of one note and partial ownership of the other, which he later acquired as sole owner. The general rules of application of payment cited by plaintiff are of no effect where such payment is made under a specific contractual obligation."
Odom is not entitled to attorney's fees on the $120,000.00 note. He concedes that this note makes no provision for attorney's fees, but argues that since he *872 sued on the collateral mortgages securing this note, as pledgee thereof, and not on the $120,000.00 note itself, he is entitled to collect the 10% attorney's fees provided in the collateral notes.
The $120,000.00 note being in default, there is no doubt that Odom, as pledgee, had a right to sue on the pledged collateral notes. He also had the right, as pledgee, to sue for attorney's fees due on the pledged collateral but in no event can he, Odom, collect and retain more than is due him on the prime obligation. Odom can collect no more than what is due him on the $120,000.00 note, and if he were to collect more the surplus would belong to the pledgor, Cherokee Homes Inc.

Error in Attorney's Fees
In the judgment appealed from Odom, as holder of the $115,000.00 note, was erroneously allowed twenty percent (20%) attorney's fees thereon. The note provides for attorney's fees of ten percent (10%) and the judgment must be corrected accordingly.

Substituted Plaintiff
Plaintiff, Dudley T. Odom, died during the pendency of this appeal and his Testimentary Executrix (Mrs. Edna Baldwin Odom) was duly substituted as plaintiff in these proceedings and stands in his place and stead.

Parcel A
All that remained of the original Parcel A after giving effect to releases for streets and lots sold prior to foreclosure were the following lots: Lots 1 and 2 of Square 3, Lot 8 of Square 7 and Part lot 3, Square 3. These are the lots which were sold by the sheriff.
Tillman's mortgages (nos. 6 and 7) cover all of these lots. Cresap's mortgage (no. 8) covers Lot 2, Square 3, and Part lot 3, Square 3. Odom's mortgage (no. 4) covers all of the lots.
In order to distribute the proceeds of the sale of Parcel A it will be necessary to determine by remand the relative value, as of the date of the sheriff's sale, between:
(a) the value of Lot 2 and Part lot 3, Square 3, and
(b) the value of the total area sold by the sheriff as Parcel A.

Rank of Mortgages
In our opinion the mortgages involved herein should be ranked in the following order:

Parcel A
1) Verret's vendor's lien mortgage (no. 1) CANCELLED.
2) Tillman's mortgages (nos. 6 and 7) as to all of A.
3) Cresap's mortgage (no. 8) as to Lot 2 and Part Lot 3, Square 3.
4) Odom's mortgage (no. 4) as to all of A.

Parcel B
1) Odom's vendor's lien mortgage (no. 2) as to all of B.
2) Tillman's mortgages (nos. 6 and 7) as to 20 and a fraction lots as follows: Part lot 3 and lots 4 to 13 inclusive of Square 3; lots 10 to 16 inclusive of Square 6; and lots 13 to 15 inclusive of Square 5.
3) Odom's mortgage (no. 12) as to all lots not covered by Tillman's mortgages as set forth immediately above.
4) Cresap's mortgage (no. 11) as to Lots 4 and 5 on Square 3.
5) Cresap's mortgage (no. 8) as to Part lot 3, Square 3.
6) Other mortgages held by Odom bearing on this Parcel.

*873 Parcel C

1) Odom's vendor's lien mortgage (no. 10).
2) Other mortgages held by Odom bearing on this Parcel.

Decree
For the foregoing reasons the judgment appealed from is corrected in part, affirmed in part, reversed in part, annulled in part, and remanded with instructions as follows:
1. The judgment is affirmed insofar as it provides for payment of Odom's vendor's lien mortgage on Parcel C; insofar as it provides for payment of Odom's vendor's lien mortgage on Parcel B the judgment is corrected so as to provide for ten percent (10%) attorney's fees on the $115,000.00 note (reduced to $109,000.00) instead of twenty percent (20%) and as so corrected this part of the judgment is affirmed.
2. The judgment is affirmed insofar as it decrees the nullity of the vendor's lien mortgage on Parcel A held by Verret and ordering the cancellation of the inscription of this mortgage; and it is affirmed insofar as it decrees the validity of the sheriff's sale of Parcel A and ordering the sheriff to proceed with its execution.
3. The judgment is affirmed insofar as it dismisses the intervention of Helmet Sales Agency Inc., Claude E. Meyer, Menson P. Verret, Home Park Inc. and Douglas L. Black.
4. The judgment is reversed insofar as it dismisses the intervention of James D. Tillman, III.
5. All other portions of the judgment appealed from are annulled and set aside and the case is remanded to the District Court with instructions to:
(a) Determine the relative value as of the date of the sheriff's sale (March 14, 1962) between the value of the total area of Parcel B included within the following twenty and a fraction lots viz.: Part lot 3 and lots 4 to 13 inclusive of Square 3, lots 10 to 16 inclusive of Square 6, and lots 13 to 15 inclusive of Square 5 and the value of total area of the lots remaining in Parcel B after exclusion of the above described lots;
(b) Determine the relative value as of the date of the sheriff's sale (March 14, 1962) between the value of lots 4 and 5 of Square 3 and the value of Part lot 3 Square 3, as compared with the value of the total area of the twenty and a fraction lots described hereinabove in subdivision (a);
(c) Determine the relative value as of the date of the sheriff's sale (March 14, 1962) between the value of lot 2 and Part lot 3, Square 3 and the value of the total area sold by the sheriff as Parcel A.
After determining the relative values as above indicated and in the light of such determination the District Judge is directed to prepare and render a judgment distributing the proceeds of the sales of Parcels A, B and C among the claimants thereto in a manner not inconsistent with the views herein expressed, such judgment to state specifically the amount due to each claimant from the proceeds of the several parcels.
It is further ordered that Menson P. Verret pay all costs of his appeal and that all other costs of this proceeding in this Court be borne in equal proportions by the Estate of Dudley T. Odom and the Heirs of Cresap. All other costs are to await final determination of the cause.
Judgment corrected in part, affirmed in part, reversed in part and remanded with instructions.